```
              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF KENTUCKY
```
**CENTRAL DIVISION at LEXINGTON**

| | |
|---|---|
| CHRIS FERNANDEZ, ) | |
| ) | |
|     Plaintiff, ) | Civil Action No. 06-130-JMH |
| ) | |
| v. ) | |
| ) | |
| LEXINGTON-FAYETTE URBAN ) | **MEMORANDUM OPINION AND ORDER** |
| COUNTY GOVERNMENT, et al., ) | |
| ) | |
|     Defendants. ) | |

    \*\*    \*\*    \*\*    \*\*    \*\*

This matter is before the Court on Defendants' motion for summary judgment [Record No. 30]. The matter being fully briefed, it is now ripe for review.

## I. Background

Christopher Fernandez ("Plaintiff" or "Fernandez") and his parents were born in the United States. Plaintiff identifies himself as Hispanic, based upon the fact that his last name is of Hispanic origin.

Plaintiff was hired as a police officer with the Lexington-Fayette Urban County Government ("LFUCG") Division of Police in March, 2004. Plaintiff began his studies at the Police Academy on March 8, 2004 and graduated on September 20, 2004, at which time he began his field training. Plaintiff was assigned to Officer Terry for the initial stages of his field training. During his second oral board exam on December 12, 2004, a board member asked

Plaintiff why they should ask him the questions if he already knew the answers, a question Plaintiff viewed as an allegation that Plaintiff obtained the answers to the exam questions prior to the exam. After his second oral board exam, Plaintiff was recommended for solo phase and was no longer accompanied by Officer Terry. Plaintiff was assigned his own police cruiser to drive during his solo phase. During his solo phase, Plaintiff was assigned to the central sector, second shift, with Sergeant Varney as his supervisor.

Plaintiff states that during roll call on December 17, 2004, Lieutenant Curtsinger asked Plaintiff, in front of other officers, if Plaintiff could speak Spanish to translate at the University of Kentucky Hospital. It is Plaintiff's statement that upon informing Lieutenant Curtsinger that he could not speak Spanish, Lieutenant Curtsinger replied, "What good are you to the Department then?"

On January 12, 2005, Plaintiff assisted Officer Cat on a call of domestic violence at a residence which was occupied by persons of Hispanic heritage. Assessing the situation and determining that no crime had occurred, Plaintiff refused to follow Officer Cat's instructions to make an arrest. Plaintiff states that at a roll call following this incident, Officer Cat accused Plaintiff of "not arresting Mexicans." Plaintiff states that on February 16, 2005, while assisting an officer during an arrest for trespassing on the railroad tracks, he was told by the other officer that Plaintiff

could get "easy arrests of a lot of Mexicans" near the railroad tracks.

Upon Plaintiff's voluntary transfer to the central sector third shift in March of 2005, Sergeant Chris Van Brackel became Plaintiff's supervisor. Lieutenant Pape was Sergeant Van Brackel's commanding officer. On April 18, 2005, Officer Hyer reported a complaint about Plaintiff's driving, noting that while driving his patrol car, Plaintiff entered an intersection on a red light without stopping to clear the intersection, without applying his brakes and at a high rate of speed. The report was forwarded to Lieutenant Pape.

On April 25, 2005, Plaintiff returned to roll call for a meeting with Sergeant Fleischer. Plaintiff states that Sergeant Fleischer informed him that he was not in good standing because he cheated on the oral board exam. It is Plaintiff's statement that upon asking Sergeant Fleischer why he was being accused of cheating, Sergeant Fleischer replied: "You people have had to always cheat to get by." Plaintiff interpreted "you people" to mean persons of Hispanic heritage.

On May 24, 2005, Sergeant Van Brackel received a report from Officer Masterson that while conducting a traffic stop due to the absence of a vehicle's tail lights, Plaintiff asked Officer Masterson if the lights were really out or if he just used that as an excuse to pull the individual over. Upon hearing this, Officer

3

Masterson questioned whether Plaintiff may have improperly made stops and reported the incident. The same day, Officer Masterson made another report to Sergeant Van Brackel regarding a traffic stop where Plaintiff was to act as backup. Officer Masterson reported that he directed Plaintiff to watch the occupants of the car, a directive Plaintiff failed to follow.

On May 30, 2005, Plaintiff received unsatisfactory marks on his solo evaluations. Sergeant Van Brackel evaluated Plaintiff's solo performance again on June 20, 2005, at which time Plaintiff claims Sergeant Van Brackel commented that Plaintiff was "no good" because he cannot translate the Spanish language.

Sergeant Van Brackel received another complaint regarding Plaintiff on July 5, 2005. Detective Sparks reported that while responding to an assault at a gas station, he directed Plaintiff to stay with the victim and two bystanders while Detective Sparks went into the store to question witnesses. Upon exiting the store, Detective Sparks observed that the witnesses were no where in sight. Plaintiff claimed to have never seen the witnesses.

As Plaintiff's commanding officer, it was Sergeant Van Brackel's responsibility to make recommendations on whether Plaintiff should be retained as a permanent employee. While evaluating Plaintiff's job performance, Sergeant Van Brackel received information that Plaintiff may have harassed female officers and females in the general public. Officer Courtney

Komara provided a written statement in which she reported that Plaintiff had alluded to the fact that he wanted to go out with her and that Plaintiff had driven to her house and shone his spotlight into her windows. Officer Komara also reported that while on duty at a basketball tournament, Plaintiff tried to get phone numbers from several women.

Sergeant Van Brackel also investigated a report that Plaintiff had harassed a female employee at a local dry cleaner. During his interview with the female employee, Sergeant Van Brackel was informed that Plaintiff would remain in the store and make inappropriate comments about women's bodies as they entered and exited the store. The employee also reported that Plaintiff commented that a customer who went through the drive-up window "had better hope that he didn't stop her later," or something to that effect. The employee reported that Plaintiff called her at home after walking to the back of the store without permission and obtaining her phone number from a bulletin board.

On July 9, 2005, Officer Stacy Shannon filed a complaint accusing Plaintiff of sexual harassment. Officer Shannon detailed three separate occasions on which Plaintiff touched her inappropriately. Plaintiff was informed of the complaint during a July 15, 2005 meeting with Captain Blanton. Plaintiff denied sexually harassing Officer Shannon and states that he requested time to review any charges with a lawyer prior to making a

5

statement, a fact Defendants dispute.  According to Plaintiff, Chief Thompson denied the request, as the investigation was an "administrative matter" which had not yet been sent to internal affairs.  Captain Blanton instructed Plaintiff to write a specific response to Officer Shannon's complaint.  Plaintiff drafted two statements in response to the complaint.

On July 19, 2005, Sergeant Van Brackel drafted a memorandum to his commanding officer, Lieutenant Pape, regarding Plaintiff's job performance.  Sergeant Van Brackel concluded that, based upon the totality of the circumstances, he did not feel Plaintiff's employment should continue past the probationary period.  The same day, Captain Blanton and Assistant Chief Bill Thompson met with Plaintiff and gave him the opportunity to resign in lieu of termination.  Captain Blanton explained that Plaintiff's employment would not be continued due to the totality of the circumstances during Plaintiff's solo performance.  Assistant Chief Thompson testified that Plaintiff presented him with a written resignation and did not request to speak with an attorney.  Plaintiff was informed that if he signed a waiver, the police department would release the information in his personnel file to potential employers at their request.  The meeting between Captain Blanton, Assistant Chief Thompson and Plaintiff was tape recorded.

After resigning from the LFUCG Division of Police, Plaintiff applied for employment with the Elsmere Police Department.  The

Elsmere Police Department faxed to LFUCG Division of Police a request for information in Plaintiff's personnel file. The request was accompanied by an authorization for release signed by Plaintiff. Plaintiff acknowledges signing the release without having reviewed his personnel file.

## II. Standard of Review

A grant of summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This burden is met simply by showing the court that there is an absence of evidence on a material fact on which the nonmoving party has the ultimate burden of proof at trial. *Id.* at 325. The burden then shifts to the nonmoving party to "come forward with some probative evidence to support its claim." *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). A material fact is one that may affect the outcome of the issue at trial, as determined by substantive law. *Celotex*, 477 U.S. at 325.

When determining if summary judgment is proper, the Court's function is not to weigh the evidence, but to decide whether there are genuine factual issues for trial. *Anderson v. Liberty Lobby,*

7

*Inc.*, 477 U.S. 242, 249 (1986); *Multimedia 2000, Inc. v. Attard*, 374 F.3d 377, 380 (6th Cir. 2004). A genuine dispute exists on a material fact, and thus summary judgment is improper, if the evidence shows "that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248; *Summers v. Leis*, 368 F.3d 881, 885 (6th Cir. 2004). The evidence should be construed in the light most favorable to the nonmoving party when deciding whether there is enough evidence to overcome summary judgment. *Anderson*, 477 U.S. at 255; *Summers*, 368 F.3d at 885. While this Court must draw all inferences in a light most favorable to the plaintiff, summary judgment may be granted "if the record, taken as a whole, could not lead a rational trier of fact to find for [the plaintiff]." *McKinnie v. Roadway Express*, 341 F.3d 554, 557 (6th Cir. 2003) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

### III.  Analysis

**A.  Due Process**

Plaintiff contends that Defendants coerced his resignation in violation of his right to procedural due process, as secured by the Fourteenth Amendment, which constitutes a violation of 42 U.S.C. § 1983. To prove a claim under § 1983, a plaintiff must establish that he was deprived of a constitutional right by a person acting under color of state law. *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994). To prove a procedural due process claim,

8

Plaintiff must show the existence of a constitutionally protected property interest and a deprivation of that interest without due process. *Board of Regents v. Roth*, 408 U.S. 564, 576-78 (1972). The existence of a property interest is largely defined by state law. *Id.* at 577. As Plaintiff has failed to establish that he had a property right in his employment as a probationary police officer with the LFUCG Division of Police, the Court need not address whether Plaintiff was deprived of said interest without due process.

It is undisputed that Plaintiff was a probationary police officer with the LFUCG Division of Police at the time of his resignation. KRS 67A.280(1) provides that "no employee in the classified service of Urban County Government, after serving a probationary period provided by comprehensive plan or ordinance for his class, shall be dismissed, suspended or reduced in grade or pay for any reason except inefficiency, misconduct, insubordination, or violation of law involving moral turpitude." The LFUCG Code of Ordinances, Chapter 23, which provides the ordinance governing the probationary period of employees of the Division of Police states: "For permanent appointment, members of the Division of Police shall serve a twelve (12) month probationary period, and that time spent in the Police Academy shall not count for the twelve (12) month probationary period for members of the Division of Police." LFUCG Code of Ordinances, Chapter 23-16(c). Because he remained a

9

probationary employee, Plaintiff had no right to employment as an officer with the LFUCG Division of Police.

In support of the argument that he did in fact have a property interest in his employment as a probationary police officer with LFUCG, Plaintiff cites KRS § 15.520. The General Assembly intended KRS 15.520 to "deal fairly and set administrative due process rights for police officers of the local unit of government." While Plaintiff is correct in his contention that KRS 15.520 sets forth the due process requirements to which a police officer accused of misconduct is entitled, Plaintiff was a probationary employee and was not entitled to the benefits of KRS 15.520. Despite Plaintiff's argument to the contrary, *Brown v. Jefferson County Police Merit Bd.*, 751 S.W.2d 23 (Ky. 1988) does not stand for the proposition that a probationary employee in an urban county form of government is entitled to the protections of KRS 15.520. *Brown* involved the interpretation of KRS 78.425, which pertains to cities of the fifth class. LFUCG is an urban county form of government governed by KRS 67A.280, which proclaims that only *after* an individual has completed the probationary period do the protections afforded by the statue vest.

Accordingly, Defendants' motion for summary judgment shall be granted as to Plaintiff's procedural due process claim.

Plaintiff also alleges Defendants deprived him of his liberty interest by releasing his personnel file, which contained

10

information that impugned his good name and reputation. In this Circuit, an injury to one's reputation, good name, honor, or integrity constitutes a deprivation of a liberty interest only when five elements are satisfied. *Med Corp., Inc. v. City of Lima,* 296 F.3d 404, 414 (6th Cir. 2002)(citing *Ludwig v. Bd. of Trustees of Ferris State Univ.*, 123 F.3d 404, 410 (6th Cir. 1997)).

> First, the allegedly stigmatizing statements must be made in connection with the loss of a governmental right, benefit, or entitlement. There is no constitutional liberty interest in one's reputation standing alone. Second, a plaintiff alleging an injury to a liberty interest must show that the defendant made defamatory statements that would foreclose his freedom to take advantage of other employment opportunities. Third, the stigmatizing statements or charges must be made public. Fourth, the plaintiff must claim that the charges made against him were false. And lastly, the public dissemination must have been voluntary.

*Med Corp.,* 296 F.3d at 414 (internal citations omitted).

As discussed, *supra*, Plaintiff did not have a right or entitlement to his employment as a probationary police officer with the LFUCG Division of Police; therefore, Plaintiff cannot even establish the first element in the analysis for deprivation of his liberty interest. Even if Plaintiff did have an entitlement to employment as a probationary police officer, it is undisputed that Plaintiff signed a waiver and authorization requesting that the LFUCG Division of Police release his personnel file to Elsmere Police Department. The fact that Plaintiff failed to review his personnel file before requesting its release is of no consequence.

11

**B.   First Amendment**

Plaintiff alleged that Defendants violated his First Amendment rights by attempting to prevent and deter Plaintiff from speaking out against Defendants' policies as they relate to the treatment of Hispanic individuals.  An employee who alleges that his First Amendment right to free speech has been violated must establish both that the speech was constitutionally protected and that his speech was a substantial or motivating factor in the decision to terminate his employment. *Bailey v. Floyd Co. Bd. of Ed.,* 106 F.3d 135, 144 (6th Cir. 1997).  The employee has the burden of identifying "specific, nonconclusory allegations reasonably linking h[is] speech to employer discipline."  *Id.* at 144 (internal citations omitted).

In the instant case, there is no evidence that Plaintiff spoke out on an issue of public interest; accordingly, there was no speech to be afforded constitutional protection.  Plaintiff admitted in his deposition that he never spoke out on the issue of alleged disparate treatment of Hispanic persons by the LFUCG Division of Police and that he "never told anybody I was going to report anything to anybody" regarding the LFUCG Division of Police's alleged disparate treatment of Hispanics.  As there was no constitutionally protected speech, Defendants' motion for summary judgment is granted as to Plaintiff's First Amendment claims.

**C.   State Law Claims**

As Plaintiff's federal claims have been dismissed, the Court declines to exercise jurisdiction over Plaintiff's pendent state law claims for violation of the Kentucky Civil Rights Act, intentional infliction of emotional distress, negligent retention and supervision, interference with prospective employment, and libel. 28 U.S.C. § 1367(c)(3).

## IV. Conclusion

Accordingly, and for the foregoing reasons,

**IT IS ORDERED** that Defendants' motion for summary judgment [Record No. 30] be, and the same hereby is, **GRANTED**.

This the 21st day of December, 2007.



Signed By:
*Joseph M. Hood*
Senior U.S. District Judge